May it please the Court, I'm Thomas Dillard on behalf of the defendant and appellant, Officer Derek Colling. Your Honor, I'd like to reserve three minutes in time for rebuttal, please. Okay, please watch the clock. Thank you. Your Honor, the District Court decision of the United States District Court of Nevada's decision to deny Officer Colling's qualified immunity defense of the summary judgment phase should be reversed because the District Court failed to apply the correct standard of qualified immunity. In fact, inverted the burden on the defendants to establish that the conduct in question, that is, using deadly force against an active and immediate threat, was clearly constitutional as opposed to requiring the non-movement to establish case law that made clear that the conduct was beyond debate unconstitutional. The District Court was trying to hone in on is a question of fact about what circumstances actually existed, not what decision was made. Can you speak to that? Whether you do it now or later, that's exactly the point I'd like to make. Certainly, Your Honor. Well, clearly, I would agree with the first part of your question. I think this is a classic example that places that Garner language center stage, that is, police officers are entitled to deference and snap judgments made in tense and uncertain, rapidly evolving circumstances. However, affording all genuine or material inferences in the favor of the plaintiff still establishes beyond question that the suspect held a victim, another, at knife point, using her as a body shield. We've had undisputed video evidence, the last ten seconds of which establishes that commands were given, those commands were disregarded, and that threat remained active at the time that deadly force was being used. So with respect to the District Court's citation of, I wouldn't even call it facts, but theories of the plaintiff, they're neither material or in light of the Scott v. Harris case, don't stand up at all to the video evidence that we have in the case. That is, the suspect was being held at knife point. That establishes probable cause. There was a fair probability to believe that person was exposed to a deadly threat. And it's a snap second decision made by the officer was made with those circumstances. Since we're fortunate to have students attending today, if we could just spend one minute setting out the scene. When your, I'll just say the responding officer, responded, what did he know from the dispatcher? The information at the time of the call, Your Honor, was a juvenile 15-year-old teenager who may have been suffering from bipolar disorder. There was a domestic violence call, and it was threatening his mother with a knife. And I think that's all he knew, right? That was the only information he had when he rounded the corner and was able to have eyes on both the teenager and the mother. When your client drove up, he had one other officer with him who was part of the crisis intervention team? Correct. All right. And when he drove up, does the record show us what he saw? Yes. The record shows, well, when he drove up, no, he didn't have eyes on the two persons. They came around a corner of a building, and then he did near the stairwell or the wall of the apartment. And there he witnessed a struggle taking place, and the facts are undisputed in this regard. The juvenile having a knife, the teenager struggling with his mother, the mother was arching her back as though she was trying to avoid being slashed with the knife. The mother, Ms. Oquendo's back was to the officers, did not know the officers were there. Mr. Chamberlain had his eyes on the officers. When he saw the officers, he was able to, right then and there, overpower his mother and circle her neck around with one arm. So he didn't have his mother, he wasn't holding onto his mother that way until the police arrived, is that right? Until he saw the officers, that's correct. But they were in a struggle at the time over the knife based on the officer's perspective, and those facts are undisputed. Okay. And so then I'm actually going to let you get to your argument here in a minute, I promise. But I think the district court found disputes of fact about whether, that she thought might implicate the immunity finding, whether the mother may have been guiding the knife, had her hand on the wrist that had the knife at her throat or near her throat, and whether Chamberlain was nearing compliance with the directive to drop the knife. Is that right? Your Honor, I would — those things were cited in the district court order, I would cede. There is no evidence to your record to establish those, and — but the court did find, the district court did find, as a matter of fact, whether at or near the knife was close to the head or neck region, and that's beyond dispute. The factual issue that I would submit to you as immaterial is whether that knife blade was making contact with flesh or right there against the throat. But the facts are undisputed. The knife was there at the neck, at the head, at the temple through all times, and that knife blade was bent in at a 45-degree angle, so the point was close that such a snap of the wrist would plunge the knife into the vital region of the victim. As for the guiding aspect, there's no evidence of that. The mother doesn't say that's what she was doing. It's just an inference from the video that counsel has underscored. But I would submit to you that several things. The video doesn't make that apparent. It certainly doesn't make it apparent to a reasonable officer at the scene, and that's one of the key parts the district court erred in. It evaluated this case with the subjective mind of both the decedent and the victim, and not an objectively reasonable lens of the officer. So when citing those facts, it's, well, that the mother said that she didn't think she'd be hurt, that he was going to comply. I mean, after the fact. After the fact, when she's interviewed. At the time, the mother said, don't shoot, didn't she? She did say don't shoot. The officers confirmed that. That must have been said before the video went active. That is the last ten seconds that she made that statement. She does not say it in the last ten seconds of the video in which repeated commands are given. He backs her up with the knife point at the edge of the rock garden in the bush and moving his head side to side. The officers report that he's sweating profusely, disassociating himself with the commands, and at that point, the shot is taken. Am I correct? But going back just a moment, the officer knew that she was the mother. Correct. The officer knew that he was a bipolar? That was the details in the call, Your Honor. Yeah. And the officer heard that the mother say don't shoot? Correct. At the beginning of the encounter. Okay. And your position is that the officer had to decide, and so, therefore, he made a split-second decision and he's entitled to immunity? Yes, Your Honor. So does that mean, essentially, that any time that an officer makes a split- second decision, he's being interpreted one way or the other, that he's entitled to immunity? Your Honor, I'm not sure I can completely agree with the way you framed it, but I would say that immunity will attach when there is arguable or colorable probable cause to believe, in this case, another was subjected to a deadly threat. Well, it just seems to me that what you're describing is a classic jury question as to whether he, given the video and everything that he knew, whether this was excessive. Well, Your Honor, I think I would point out the cases that have come out with the Supreme Court in the last several years, Scott v. Harris, Stanton v. Sims, the Plumhoff case last year and just this last month, the Sheehan case. And the takeaway from those cases I think could not be any more clear, and that is the first part is a cry to show me the case. They have to show the case that establishes beyond debate that that conduct in those circumstances was violated Federal law. And there's no such case. So it seems like there's two different pieces to your argument. You seem to be arguing that there wasn't any constitutional violation here because the police officer's actions were reasonable in light of the circumstances. But then even without reaching whether there's a constitutional violation, we would have to also say that it wasn't clearly, at that time it was clearly established that an officer in that situation couldn't use that force. So we would have to say that there was a Supreme Court precedent saying when you see a son holding his mother in a protective way against the police with a knife at her face, that that was, that you couldn't use force at that point. Is that correct? Yes, Your Honor. That specific? We'd have to have on-point authority that specifically? Well, the standard I think has been made pretty clear in those cases I just cited. And what it is, is it's controlling authority or a clear and robust consensus of authority. Well, the Supreme Court said in its latest cases that even if that's the rule, that you need a consensus. Has the Supreme Court ever said there's a requirement for a consensus? Yeah. Well, a clear and robust consensus. I believe that's the language from the Al-Kid case and underscored just last month in the Sheehan case. And, you know, when that, in the Sheehan case last month, the Ninth, excuse me, the Supreme Court was discussing Ninth Circuit precedent, the Diorley case, the Alexander case in Garner. And looking at that and those circumstances, it was entry into a room to, and then use deadly force on a person with a knife in self-defense. The Court looked at those cases and says they're poor fits. They don't make it clear that there was not an exigency to act in those circumstances. That is, go in and control a subject with a knife. And that same thing establishes here. Those case laws that we have, and Diorley is chiefly cited in this circuit, do not establish that the officer did not have those exigent circumstances, did not have arguable probable cause to believe there was an actual imminent threat, and waiting any longer to be talked down, to wait, simply expose the victim to a threat, to be killed. And there's no case law that the officer has to stay his hand in those circumstances and not fire in hopes that compliance will be had or in hopes that he will lose interest. And those circumstances in which the shot was taken, my rebuttal time is gone,  Your Honor. Thank you very much. May it please the Court, Counsel. My name is Ebert Bryson. I represent the appellees. And Your Honor correctly identified the major flaw in Counsel's case, is that the fact that the lower court found were disputed and, therefore, it's proper that this matter go to a jury trial. Could you explain the implications of Sheehan, the Supreme Court case, as decided and how this affects our analysis here, if at all?  The most important aspect of Sheehan, as it affects the instant case, is that Sheehan appeared to codify what this circuit has held for a long time, which is a violation of an internal policy and procedure does not give rise to a constitutional violation. However, it may be indicative and certainly is part of the analysis regarding whether or not the officer acted reasonably. So in that case, the Supreme Court overturned us and warned us again not to fashion the clearly established rule at too high a level of generality. And in that case, even though there wasn't any immediate threat to a third party, the Court said the officers could reasonably have been concerned there was someone else in the room or that the person could escape down the fire escape. So here we have a situation where there was a hostage or there was apparently a hostage and a person with a knife apparently threatening her. Why doesn't Sheehan just control our decision here? Well, first of all, in Sheehan you had an individual that had threatened a social worker, first of all, actually threatened to kill. You had officers that arrived and the individual threatened to kill the officer the first time they entered. The second time the officers entered, the individual actually came at officers with a knife in hand. There was also concerns regarding the environmental aspects. In Sheehan, the individual was in an enclosed room and there was also concern that the individual perhaps could escape outside a window down a flight of fire escape stairs. In this particular instance, there were no verbal threats whatsoever made towards the mother. There were no verbal threats made towards officers. Officer safety was not at issue here. But the mother's safety was, right? There was danger to life. That was the concern. Well, that may have been the original concern. At the time of the shot, and as this Court is well aware, this circuit has held that the analysis as to the use of deadly force occurs at the precise moment that the force is used. At the precise moment that the force was used in this particular case, the video demonstrates that there are multiple issues of disputed facts. And this goes back to my very first question. Multiple issues of fact, according to the district court judge, about exactly what circumstances the officer faced, as opposed to second-guessing his opinion. That's his decision. That is your argument, right? In essence. And let me expound upon that and explain from our standpoint the setup and the environment, what the officer was perceiving as the events unfolded at the time, not from a 20-20 hindsight. Yes, but when you do this, here's my problem, and maybe you can keep this in mind as you go through this. I've made it pretty clear that I think that it's very important whether there's dispute of fact about what the circumstances were that the officer was encountering. On the other hand, we have case law that says very clearly we have to be very careful about second-guessing a snap decision that the officer has to make in the field. And so as you go through, and I read your brief carefully about the questions of fact, one gets the impression that this took place over the period of several minutes, and in fact it took place very, very rapidly over the period of seconds. It did take place. It makes it inherently difficult to second-guess the officer's opinion. And maybe you could speak to that as you're talking about these issues of fact, because that's my problem. I'm not second-guessing the officer's conduct. The officer's conduct, as soon as, first of all, you have an open area. It's late in the afternoon. It's daylight. There are multiple officers that are present. At the time the officer is around the corner, Officer Colling and Officer San Martin, they see the individuals. Tanner Chamberlain, the decedent, also sees officers approaching. Officer Colling draws his weapon and is advancing towards Ms. Aquindo and Tanner. As he's advancing. Was he running? Tanner? No, the officer. The officers were not running, but they were not walking slow. I think they described it as a fairly rapid gait. Okay. And he drew his service revolver after he rounded the corner? He did. Okay. And at that point, there's approximately a 10 to 15-second period. Okay. As they advance, you hear you don't hear on the tape, but the testimony is uncontradicted, that Ms. Aquindo shouts, don't shoot, don't shoot. She then grabs Tanner. So at some point, and I'm sorry to interrupt you again. That's okay. But opposing counsel said her back was to the officers. She clearly was aware the officers were there because she said don't shoot. Well, as it happened, her back was originally to the officers. When Tanner was in the process of de-escalation, he saw the officers approaching. They get up. Tanner spins her around. Right. She is now facing the officers. And if you see the video, and I'm certain that the Court is well versed in the facts, you see that Ms. Aquindo actually grabs Tanner's arm. She is now in control, or at least there is a dispute as to whether or not she's in control of the hand that the knife is in. As this Court is well aware, the mere having a weapon is not in and of itself, does not justify the use of deadly force. So you have a knife in the hand, clearly. You have Ms. Aquindo holding the arm of Tanner, backing up. You actually see her. She's backing up. She's attempting to cause distance between herself and the officers, stating don't shoot, don't shoot. Well, I can't tell if she's doing that or if he's dragging her, actually. From the video, to me, that's ambiguous. But okay. That is our version, and I submit that it's at least a disputed fact for purposes of this appeal and also for summary judgment. Officer Colling makes a decision immediately when he rounds the corner that he's going to shoot. He never changes that decision. How do we know he made that decision immediately? Because he states that his weapon is trained on the two individuals as soon as he gets a head shot on Tanner. And at this point, he knows that Tanner is a 15-year-old, bipolar. The mother is not the person that called for 911. It was a third-party information call that was called to the police. They're aware of that. There is a CIT officer, which is a crisis intervention officer, that is trained to deal with these type of situations. Officer Colling completely disregards all of those facts, the totality of the circumstances, never changes his mindset because as soon as he gets an open shot, he shoots Tanner, knowing that he's going to kill Tanner. It is a head shot. It's the only shot that is available to him. So within a period of 2 to 5 seconds, he shoots and kills Tanner. Right when Tanner begins to comply with the senior CIT officer, Officer ---- But what we know is that Tanner turned to look at the CIT officer. That's right. When you say he started to comply, he turned to look, right? Well, I submit to the Court that that would be the first part in compliance. But my question is, not to belabor the point, but did he do anything else that indicated that he was complying? He had no time. As soon as he turned ---- The answer is no. I really need to answer the question. That's what Tanner did. He turned. Right. That's all he was able to do. All right. Because as soon as he turned, he was shot. So in other words, Officer Colling used the first step of compliance where Tanner is turning towards Officer Maury that is instructing him, let me talk to you, let me talk to you. He literally has that much time, and then he is shot. Now ---- And, of course, opposing counsel's argument is that he was shot then because the officer testified, that's when I had the first free shot where I could safely shoot without hitting mom. Right. That's opposing counsel's argument. That's opposing counsel's argument that also substantiates the fact that it's my position and our argument that Officer Colling made the decision to kill Tanner and to shoot Tanner as soon as he rounded the corner and saw what was going on. He never changed his mind. He did not take into account at that point that you have a mostly disturbed individual, which we know under Diorly is a factor that must be considered. He also, I would say that's indicative of his intent, he never gave any warnings. He did not give any warnings such as stop or I'm going to shoot, drop the knife or I'm going to shoot. You're discussing the ---- whether there's a constitutional violation. Could you also address what's the clearly established law saying that a reasonable officer in this situation would be incompetent if they shot in this situation? Well, first of all, regarding clearly established law, I believe it's clearly established, not only in this circuit but across the land, that you can't shoot and kill a suspect who is not an immediate threat to officers or others. Right. That's a given. But the Supreme Court has said not to use and has admonished us frequently not to formulate the clearly established at a high level of generality and have indicated it has to be fairly specific. So can you explain to me what the specific clearly established law is? The Supreme Court said Diorly was not it for Sheehan, so it has to be more on point than Diorly was for the Sheehan situation. Well, first and foremost, I don't believe that Sheehan overruled Diorly, first of all. Right. But it said it wasn't the clearly established law in the situation of the mentally disturbed woman with a knife in the room. I would direct the Court to the case of Hayes v. County of San Diego, 736F3-688, where the Court determined that a shot in a matter of four seconds was a short time. And what was the facts in Hayes? Perhaps you could explain that, how they were similar to the facts here. Well, it's similar from the standpoint that you have a quick shot. And in Hayes, you actually had an individual that was approaching officers with a weapon in hand. So in other words, it triggered the officer's safety standpoint. And the distance was within six to eight feet. But here, the knife, the boy was holding the knife immediately within inches from his mother. So I'm struggling on that one. With all due respect, I believe the video raises a dispute as to the distance and the area and, most importantly, who was in control of this knife. The mother at this particular time had a hold of Tanner's arm, the decedent's arm, the hand that held the knife. When you see the video, you see her holding this and moving backwards, clearly at this point stating, don't shoot, don't shoot. She is not the one that called 911. She is not the one that said, I'm in imminent danger of being hurt. Indeed ---- Well, assuming that we viewed the video and, per Scott V. Harris, can make up our own mind about what the video says, and assuming we disagree with that, what case is on point? Well, I would also state that the case of Hagen v. Brasso, which states that the fact that a suspect poses a weapon does not in itself justify deadly force. I would also refer the Court to Teen v. United States, 927 F. 2nd, 1504 Ninth Circuit, here within this Ninth Circuit. What's the case with the facts that are closest to these facts? Well, first and foremost, it is not required under clearly established that you have a case that's on all four points. No, but it has to be fairly close is what the Supreme Court has told us. So my question to you is what's the case that's the closest factually, not one that has principles of law in it, but that officers who are presumed to be aware of this particular factual pattern would know it applies to them in the facts that they faced in this case? I would say it would be a totality of cases. It would be Anderson. It would be Diorly. It would be Hayes. It would be Ting. It would be Hagen. When you combine all these cases together, then it's clear that, number one, the officer must act reasonably, objectively reasonable. I submit to the Court that it's not objectively reasonable. Those cases all talk about, at least the majority of them talk about, quick shots, warnings that must be given prior. If the decedent is mentally ill or if the individual is mentally ill, you must take that into consideration. How does that cut? How does the last factor cut? Does that make the person with a knife being mentally ill make his conduct less predictable, more dangerous, or the other way around? No, not at all. A person that is mentally ill with a knife, I'm not submitting to this Court, there needs to be two separate standards. There is not. That would be an impossibility. But I think you're right. The law says we take it into account. But which way does it cut? Well, according to the law, as I read the law, it cuts that it's a factor that must be considered in the totality of the circumstances. How does it cut? It depends upon the individual facts of each case. Right. So this officer had a few seconds to make the decision. Is it your argument that he was unreasonable in concluding that the mother's life was in danger? Yes, at that time. Okay. So can you tell me exactly why? What made that unreasonable? Because the officer's conduct has to be judged at the precise time the force is used. At the beginning, before the officers got there or on their way, if indeed the knife was at the mother's throat, okay? At that point, if he could have made a shot, I would say that would be a good shot. We have like a bell curve, if you will. So your time's just about up. So you've told me at the beginning it would have been okay. What changed? What made it unreasonable? He no longer had control of the knife pursuant to the video. And second, the escalation, his behavioral escalation was on the decline. He was now starting the process of compliance with Officer Maori's CIT commands, and he shot on the way down. Okay, so objectively, sorry to interrupt, but objectively, I think your answer to my question is the officer could see mom's hand on his wrist. That's one. And the two is he had started to comply, which I think you answered earlier meant he had turned to look at the CIT officer. Is that it? He had turned to look. He never made any verbal threats. And the distance between officer calling and the suspect when he shot was 6 to 10 feet. He could clearly see everything. All right. Okay, I think your time has expired. Thank you. Thank you for your argument. Your Honor, just on the qualified immunity issue, the language is that they're controlling authority or robust consensus of cases of persuasive authority. But I think that the Sheehan case really made that find a pretty tight fit. And one of the key languages, and I think it gets back to Judge Ikuda, your question, the language is breathing room, that qualified immunity establishes breathing room for the officers to act in these situations. And to second guess, I think the district court's decision, the error it made, at least in part, is it was the height of Monday morning quarterbacking and really was getting into the subjective intent of the decedent. The video shows that his head is on a swivel, and he's got officer here calling on one side, San Martin with the taser video in front, and others coming around the other corner. His head is on a swivel with a knife point at his throat evaluating fight or plunging the knife's circumstances, assuming he's acting rationally. And we don't know that. Getting back to your question, we have no idea whether he's lucid, whether he's making informed choices. We do know that he physically out-overpowered his mother, took her at knife point as a body shield, and would not comply within the video parameters. We have 10 seconds of commands to drop the weapon, calm down, and that knife is still. If not pressed against the head or neck, right there, that a flick of the wrist could plunge the weapon into a vital part of the body. Those are the circumstances in which the officer shot. And to say that, well, the mother said don't shoot. Well, show me the case. Show me the case that you can consent to victimhood, that that would override the officer's decision that a family member, if she said that, whether she still meant it at the time, 10 seconds later, who knows? But that's all that second-guessing that's just improper. Do you agree with the fact, as your adversary has just described them in the case? No, Your Honor. And I think the video speaks for itself that it doesn't agree either. Well, if you have one version of the facts and the plaintiff has another version of what happened, then isn't it normally up to the jury to decide what happened? True, Your Honor. But let's look at that Scott v. Harris case. The court, it used to be kind of a, who can tell that line between genuineness and materiality? Materiality is certainly center stage of qualified immunity on appeal. But that Scott v. Harris case said facts that are supported by the record and unwarranted deductions or arguments of counsel or his spin on the video is not evidence. I understand. Thank you, Your Honor. I think we have your argument. Thank you. Case of Oquendo v. Las Vegas, Metropolitan Police Department is submitted.
judges: Schroeder, Ikuta, Christen